UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MAURICE WILLIAM MINER-GITTENS,<br><br>Defendant. | Criminal No. 14-10075-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                                                                           December 16, 2014

### I.    Introduction

Defendant Maurice William Miner-Gittens ("Miner-Gittens") has moved to suppress the fruits of his stop and seizure on December 20, 2013. D. 84. Having considered the motion (and supporting memorandum, D. 85), the government's opposition, D. 93, the evidence (including testimony and exhibits) presented at the evidentiary hearing on the motion and oral argument held on November 6 and 12, 2014, D. 99-100, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

### II.    Findings of Fact

These findings are based upon the testimony of U.S. Postal Inspectors Michael Connelly, Scott Kelley and Sean Boyce, and Boston Police Officers Joshua Delisle and private investigator Joseph Lutz who testified at the suppression hearing and the exhibits introduced at that hearing.

#### A.    Postal Carrier Assaulted and Shot on His Route

The stop and arrest of Miner-Gittens arose out of the assault and shooting of a postal carrier in Dorchester on the evening of December 20, 2013. The postal carrier was delivering a

1

package on Bailey Street in Dorchester. D. 99 at 18-19. When he returned to his postal truck, the postal carrier encountered an assailant in the cab of the truck. Id. The postal carrier described him as a black male, between 20 to 30 years old, 5'8 to 5'10 tall, who was wearing a ski mask and black hooded jacket or sweatshirt. D. 99 at 8-9, 18-19. The assailant put a gun to the postal carrier's head and demanded his phone, keys and the "drawer." D. 99 at 19-20, 66. The postal carrier informed him that he did not have a drawer and attempted to push the assailant out of the truck. Id. at 20. At this attempt, the assailant shot the postal carrier in the arm and pistol whipped him. Id. In the course of assaulting the postal carrier, the assailant broke the handle of the firearm over his head. Id. The assailant then ordered the postal carrier into the rear of the postal truck to remove his uniform. Id. at 20-21. The assault took the wheel of the truck and proceeded down Bailey Street. Id. at 21. While in the back of the truck, the postal carrier managed to open the back cargo door and escape. Id. at 21, 66. As he ran from the truck, the postal carrier observed that a white U-Haul van was right behind the postal truck. Id. at 21. He also observed that a black male, between 20 to 30 years old and with a dark complexion was driving the U-Haul van. Id. at 21-22, 40, 45, 46. The postal carrier remembered having seen a U-Haul van in the area, earlier on his route. Id. at 22, 41. The postal carrier managed to run down Bailey Street, ending up at a VFW post on that street. Id. at 8, 14. Witnesses in the area called 911 and the postal carrier was taken to Boston Medical Center. Id. at 8, 18-19.

**B.      The Investigation Begins**

After the 911 calls, numerous law enforcement officers reported to the area of 74 Bailey Street, the scene of the crime. Id. at 6. Postal Inspector Michael Connelly reported to the scene about forty-five minutes to a hour after being called to the scene (roughly 6:45 to 7 p.m.). Id. at 7. Connelly was the primary investigator for the Postal Inspectors and worked closely with the

primary investigator for the Boston Police Department ("BPD"). <u>Id.</u> at 7, 39-40. When officers arrived on scene, the postal truck was up on curb at Bailey and Clermont Streets. <u>Id.</u> at 10-11; D. 100 at 27; Exh. 1. Witnesses in the area had seen the driver of the postal truck park or crash it at this location and then flee on foot between two houses on Clermont Street. <u>Id.</u> at 15; see D. 100 at 30. Witnesses had also observed a U-Haul van trailing the postal truck; once the postal truck was up on the curb, the U-Haul was observed turning on Clermont Street at a high rate of speed. <u>Id.</u> at 15-16; D. 100 at 31.[1] While Connelly was on scene, other law enforcement officers had interviewed the victim, including Postal Inspector Reardon who interviewed him at Boston Medical Center. <u>Id.</u> at 8-9, 18-19, 20. The postal carrier's description of the assailant, described above, was transmitted to other officers involved in the investigation. <u>Id.</u> at 18-19, 20; D. 100 at 29 (Boyce testifying that transmittal of this description occurred around 8 p.m.).

Given the description of the assailant's flight path between houses on Clermont Street, the officers investigated this area and found fresh footprints in the snow leading from houses on Clermont Street into the backyard of a residence on Fuller Street. <u>Id.</u> at 24-25. This path lead to a chain link fence and a retaining wall where the officers found a portion of a purple, nitrile glove and what appeared to be blood. <u>Id.</u> at 25-26; D. 100 at 30; Exhs. 7-8. As part of canvassing the area, Postal Inspectors Scott Kelley and Sean Boyce reviewed surveillance footage from Fuller Market covering the intersection of Fuller and Washington Streets. <u>Id.</u> at 29-30, 70-71; D. 100 at 31-32. This intersection is approximately a half of a mile away from the crime scene. D. 100 at 34. The footage showed, around 6 p.m., a postal truck (that looked like the one later found up on the curb) followed shortly thereafter by a U-Haul truck that turned right on Washington Street in the direction of Bailey Street. <u>Id.</u> at 71, 102; D. 100 at 32-33; Exh. 24;

---

[1] One witness said that the U-Haul van went down Bailey Street, but the other witnesses said that it continued down Clermont Street and then Fuller Street. <u>Id.</u> at 49, 68.

see Exh. 2. A short time later, at approximately 6:09 p.m., the footage showed a U-Haul van alone crossing the intersection of Fuller and Washington Streets. D. 99 at 72; D. 100 at 33; Exh. 24. Also as part of the canvassing effort, Kelley and Boyce went to a nearby U-Haul rental location on Gallivan Boulevard to investigate whether any vans had been recently returned. Id. at 51, 74-75; D. 100 at 3-39. Although the location was closed, none of the vans' hoods were warm or otherwise indicated having recently been returned. Id.[2]

### C. Postal Inspectors Spot a U-Haul in the Vicinity

After leaving the U-Haul rental location, Kelley and Boyce were traveling on Gallivan Boulevard toward Washington Street. Id. at 75. As they were making a left on to Washington Street, toward Bailey Street, Kelley and Boyce observed a U-Haul van traveling in the opposite direction. Id. at 76; D. 100 at 39. They observed that there was a driver and passenger in the front seat. They observed that they were both black males, id. at 76; D. 100 at 40, but they could not make out their relative complexions, height or hairstyles, id. at 114, or what clothing that they were wearing. D. 100 at 40. They, however, had not seen any other U-Haul vans in the vicinity. Id. at 77; D. 100 at 72. Upon spotting the van, the officers made a U-turn and followed the vehicle. Id.; D. 100 at 39. When the van got to the intersection at Gallivan Boulevard, it stopped in the middle of the intersection and appeared to be about to make a left turn, without signaling, but then instead pulled into a Sunoco station. Id. at 78, 81, 108; D. 100 at 43. (Upon this observation, the inspectors were concerned that the two men had spotted the officers and were engaged in counter-surveillance moves. D. 100 at 44-46). The agents pulled past the gas station and pulled alongside the station to observe the van. D. 100 at 44. The van pulled into the

---

[2]The defense offered the testimony of Joseph Lutz. D. 100 at 75 *et seq.* Prior to the suppression hearing, in or about October 2014, Lutz had conducted an inventory of two local U-Haul locations, one on Fairmount Avenue in Hyde Park, D. 100 at 76-77, and one at 985 Mass. Avenue in Boston. D. 100 at 79-80; Exhs. 29-32.

bank of gas pumps to the left, but initially no one got out of the car. Id. at 82. At this point, Kelley called for backup. Id. at 83; D. 100 at 46.

### D. Investigation Unfolds Rapidly at Sunoco Station

The driver of the U-Haul van, later identified as Miner-Gittens, got out of the vehicle and started to walk toward the gas station store. Id. at 83-84. Around this time, a marked BPD sports utility vehicle ("SUV"), driven by Officers Delisle and Christopher Goodman, arrived as backup. D. 100 at 7. Delisle testified that he parked near the driveway of the Sunoco station, but not in front of van. Id. at 7, 15; Exh. 27.

Kelley and Boyce testified that the BPD vehicle pulled in off to the left front of the van and Boyce and Kelley's vehicle moved in behind the van. Id. at 84-85, 116; D. 100 at 47-48.[3] Kelley approached the van on the driver's side and saw what appeared to be blood on the side of the van. Id. at 87, 118; D. 100 at 50; Exh. 14-16. Upon this sighting, Kelley shouted out his finding to alert the other officers. Id. Boyce testified that Kelley did so seconds after they had exited their vehicle. D. 100 at 74. Kelley also then observed what he believed to be blood on the driver's side door. Id. at 89; Exh. 17. At the driver's side door, with the door slightly ajar and the window partially down, Kelley also detected the odor of marijuana. Id. at 88-89; D. 100 at 52.

BPD Officers had stopped Gittens while outside of the gas station store. Id. at 95; D. 99 at 49. Those officers stopped Gittens in front of the van by the gas station store. Id. at 89, 91, 121. At this point, the passenger, later identified as Kemron Roach, id. at 63, was still in the vehicle. Id. at 89-90. Kelley shone a light in the vehicle and saw Roach. Id. He also saw a purple glove in the cup holder and a black jacket between the seats. Id. at 90, 93; D. 100 at 52.

---

[3]Delisle testified that he stopped and parked parallel to the Sunoco station. D. 100 at 10.

Kelley also observed some duffel bags and a purse, id. at 94, although the back of the van was empty. Id. at 122. Kelley asked Roach to step out of the van. Id. at 92-93. At some point after Roach was out of the vehicle, Delisle and Boyce were at the passenger side door and Delisle conducted a pat-frisk of the passenger (Roach), who was already out of the van. D. 100 at 12, 20-21; D. 100 at 60, 73-74. The observations in and around the van took place in a very short time after the postal inspectors' arrival at the Sunoco station. D. 99 at 95; D. 100 at 53.

Both Gittens and Roach were arrested and taken into custody. Id. at 96-97.

### III. Discussion

#### A. At a Minimum, Law Enforcement Officers Had Reasonable Suspicion to Stop Gittens at the Sunoco Station

It is well settled that to conduct an investigatory stop, law enforcement officers need only reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). The stop must "be supported by a reasonable and articulable suspicion of criminal activity . . . and that the detention must be reasonable under the circumstances." United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001). For a Terry stop, the government must show that the stop was "justified at [its] inception" and reasonable in terms of its scope. Id. at 6. If the stop was justified at its inception, the Court must further determine "whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." Id. at 6. Moreover, a law enforcement officer's observations do "not have to be correct to constitute reasonable suspicion." United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010); see Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Furthermore, "'a fact that is innocuous in itself may in combination with other innocuous facts take on added significance'" which may "culminate[ ] in reasonable suspicion. United States v. Wright, 582 F.3d 199, 212-13 (1st Cir. 2009) (quoting

6

United States v. Ruidiaz, 529 F.3d 25, 30 (1st Cir. 2008)). Moreover, reasonable suspicion may arise "not just from the combination of facts, but from their *progression*. . . . reasonable suspicion can be based on 'unfolding events,' with suspicion accumulating as more innocent interpretations of the historical facts fall by the wayside." Id. (quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)) (emphasis in original).

By the time the officers encountered Gittens at the Sunoco station, they had specific, articulable facts upon which to rely for reasonable suspicion. First, they were aware that a postal carrier had been assaulted and shot only a quarter mile away. Second, both the postal carrier and other witnesses indicated that a U-Haul van, fitting the description of the one that Gittens and Roach were later seen traveling in, had been seen trailing the postal van. The postal carrier saw it right behind the postal truck when he fled from his assailant; the Fuller Market video at the intersection of Fuller and Washington Streets showed a U-Haul van trailing a postal van shortly before the time of the shooting and a U-Haul van was seen a short time after that in and around the time that witnesses had seen it speeding from the area of the shooting in the direction of Washington Street. Third, the postal carrier had given a description of not only his assailant (who wore a mask during the assault, but whose skin was visible around the eyes) in terms of complexion, height, weight and black jacket, but also a description of the black male who was driving the U-Haul van. Fourth, at the time that Inspectors Kelley and Joyce saw Miner-Gittens and Roach drive past them in a U-Haul van, although four hours had passed since the shooting, they had not seen any other U-Haul vans in the vicinity of the crime. Fifth, when Kelley and Joyce made a U-turn and began to follow the van, the van engaged in what the officers could have reasonably thought were evasive moves (e.g., slowing down in the intersection, beginning to turn left with no turn signal and then, instead, pulling into the gas station). Sixth, when the

van pulled into the bay of gas pumps, no one initially emerged from the vehicle. At this juncture, the officers, at a minimum, have reasonable suspicion to make a threshold inquiry of Miner-Gittens.

To the extent that Miner-Gittens argues that these circumstances did not amount, even when taken together, to reasonable suspicion, the Court does not agree. The defendant contends that, at base, the only observed similarity between the defendant and his passenger when the officers passed their U-Haul van and the suspects described by the victim and other witnesses was that they were African American men. This contention, on this record, misses the mark as to whether there was reasonable suspicion to approach Miner-Gittens at the Sunoco station and ignores the totality of circumstances. First, Miner-Gittens and his passenger were not any African American men in the area, but two individuals, who were in the vicinity of the shooting, who matched the general description of the two suspects, and were traveling in a U-Haul van, the type of vehicle seen by several witnesses, including victim, trailing the postal truck. Although the defense argues that a white U-Haul van is "ubiquitous," D. 85 at 4, the officers testified that in the several hours of canvassing the area after the shooting, they did not encounter any other U-Haul vans in the area. The defense's proffered inventory of two local U-Haul rental locations in October 2014 does little to refute the lack of any suggestion that there were multiple U-Haul vans of similar description in the area on December 20, 2013, the date of the alleged incident. Moreover, the officers initially just followed the van once they spotted it and, in the course of doing so, observed the van, driven by Miner-Gittens, engage in what the officers took to be counter-surveillance moves and enter, after hesitation about its direction at the Gallivan Boulevard intersection, the Sunoco station. Even once at the gas pump, no one immediately emerged from the vehicle, further arousing the officers' suspicion.

Moreover, the record does not suggest that the stop of Miner-Gittens while outside of the Sunoco gas station store was initially more than an investigatory stop and amounted to a de facto arrest.[4] It was clear that the observations made by the officers in and around the van once at the Sunoco station unfolded quickly. D. 99 at 95; D. 100 at 53. In the rapid succession of observations that Kelley makes in and around the van while Gittens is returning toward van from the gas station store, he observes what appears to be blood on two locations on the exterior of the van on the driver's side and smells the odor of marijuana. Shortly thereafter, the postal inspector observes a purple nitrile glove (consistent with evidence gathered near the crime scene) and a black jacket (described by the victim as clothing the assailant was wearing) in the front of the van. All of this information gave the officers not just reasonable suspicion, but probable cause to arrest Miner-Gittens. That is, the initial encounter and stop of Miner-Gittens outside of the gas station was brief before the officers had probable cause to arrest Miner-Gittens and did so. That numerous other officers may have then been reporting to the scene, D. 100 at 63 (Boyce estimating ten to twelve officers arriving); D. 100 at 22, does not change the fact that the officers had, at a minimum, reasonable suspicion to conduct an investigative stop when Kelly and Boyce initially arrived at the station and that such basis rapidly morphed into probable cause for arrest upon Kelley's observations in and around the van.

---

[4]There was some inconsistency between Delisle's testimony and Kelley and Boyce's testimony regarding where Delisle's vehicle, the BPD SUV, parked when it arrived at the Sunoco station. Even, however, if the Court credits the postal inspectors' testimony that the BPD SUV pulled into the gas station off on the front left of the U-Haul van, this still does not support the defendant's theory that his egress was blocked because the van was now blocked from the back and from the front. Even in the inspectors' accounting, neither the SUV, D. 100 at 13 nor Postal vehicle, D. 99 at 117, was blocking egress of U-Haul van from Sunoco station. Id.; D. 100 at 47-48.

## IV. Conclusion

For all of the aforementioned reasons, Miner-Gittens's motion to suppress, D. 84, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge